UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CEI GROUP LLC,                                      Case No. 19-11611

      Plaintiff                              Stephanie Dawkins Davis
v.                                                 United States District Judge

C.E.I. COMPOSITE MATERIALS, LLC,

      Defendant.

_____/

**ORDER DENYING MOTION FOR
PRELIMINARY INJUNCTION (ECF No. 22)**

## I.   PROCEDURAL HISTORY

Plaintiff, CEI Group, filed its complaint alleging trademark infringement

against CEI Composite Materials, on May 31, 2019.  (ECF No. 1).  CEI Group

filed an amended complaint, as of right, on July 3, 2019.  (ECF No. 6).  A second

amended complaint was filed on September 3, 2019, with leave of court.  (ECF

No. 16).  On October 10, 2019, CEI Group filed a motion for preliminary

injunction, seeking to preclude CEI Materials from using the name or mark "CEI."

(ECF No. 22).  This matter is fully briefed.  (ECF Nos. 27, 28).  The court held a

hearing, via video on August 4, 2020, pursuant to notice.  (ECF Nos. 32-33).

For the reasons set forth below, the Court **DENIES** CEI Group's motion for

preliminary injunction.

## II.    FACTUAL BACKGROUND

CEI Group is a Michigan-based, national commercial construction firm specializing in challenging commercial roofing installation projects and exterior wall panel installation with a focus on the entire building envelope (i.e., the exterior walls and roof of a building).  (ECF No. 22-2, Ex. 1, ¶ 7).  CEI Group traces its origins to the 1969 founding of Cook Roofing Company, which later changed to Cook Enterprises, Inc., and subsequently adopted the name, CEI.  *Id*. ¶¶ 4, 10.  CEI Group, along with its predecessor(s), subsidiaries and affiliates, has continuously provided specialty roofing and architectural sheet metal fabrication and installation services throughout the United States for over 50 years.  *Id*. ¶¶ 17-18.  CEI Group conducts business through its wholly-owned subsidiary and operating entity, CEI Michigan, LLC, over which CEI Group exercises direct control.  *Id*. ¶ 12 (collectively referred to as CEI).  Part of CEI Group's business includes sheet metal fabrication.  CEI Group operates a sheet metal shop to fabricate the custom architectural components that it installs, such as (a) edge metals (used to terminate roof systems at edges of the building envelope); (b) full sheet metal roofing; (c) metal siding; and (d) exterior wall panels.  *Id*. ¶ 21.

CEI Group obtains its work mostly through competitive bidding.  *Id*. ¶ 15. CEI Group reviews a set of plans and specifications for the work to be performed and creates a cost estimate that it reduces to a bid or dollar cost to perform the

work.  *Id*.  Additionally, CEI Group has cultivated and maintained long-term relationships with its customers: property owners, general contractors, construction managers, property managers, school districts, other specialty contractors, and universities.  *Id*. ¶¶ 16-17.  Based on these relationships, ninety-nine percent (99%) of CEI Group's work comes from receiving an invitation to bid from a customer. *Id*. ¶ 16.  CEI Group only employs union labor for its fabrication and installation services, which is well-known in the industry.  *Id*. ¶¶ 19-20; ECF No. 22-3, Ex. 2, ¶ 9.  CEI Group employs union labor, in part, because its installation jobs require a highly skilled workforce.  (ECF No. 22-2, Ex. 1, ¶ 19).  Hence, CEI Group does not subcontract its labor or installation work.  *Id*.

CEI Group's use of the trademark "CEI" in connection with its construction business dates to at least as early as November 1982.  (ECF No. 22-2, Ex. 1, ¶ 10). CEI Group has obtained and developed both federally registered trademark rights and common law rights in the mark "CEI."  *Id*.  CEI Group says it owns two United States Trademark Registrations for the mark "CEI" in connection with "installation of roofing systems."  *Id*. ¶ 12.  Specifically, CEI Group owns U.S. Reg. No. 1,513,926 issued November 22, 1988 for a graphic mark and U.S. Reg. No. 1,516,681 issued December 13, 1988 for the word mark, "CEI."  (ECF Nos. 22-4, 22-5, Exs. 3-4).  CEI Group contends that both of its trademark registrations are incontestable.  CEI Group also owns U.S. Reg. No. 5,805,215, issued July 26,

3

2019 for the word mark "CEI" for "installation of siding and wall panels."  (ECF No. 22-6, Ex. 5).

CEI Group also maintains that it has developed and owns common law trademark rights in the word marks "CEI" and "CEI MICHIGAN."  Through many years of use, CEI Group has acquired these common law trademark rights for its commercial roofing installation, architectural sheet metal fabrication and exterior wall panel installation services.  (ECF No. 22-2, Ex. 1, ¶ 10).  At least as early as 1999, CEI Group began using the mark "CEI" in connection with its wall panel installation services. *Id*. ¶¶ 22-23.  And as early as 2005, CEI Group began using the mark "CEI MICHIGAN" for commercial construction services, including at least roofing installation services and exterior wall panel installation services.  *Id*. ¶ 13.  CEI Group contends that its common law trademark rights have arisen through use by CEI Group and its wholly owned subsidiary and operating entity, CEI Michigan, LLC, over which CEI Group exercises direct control.  *Id*. ¶ 12.

Defendant CEI Materials was organized in Michigan in December 2008 as "C.E.I. Composite Materials, LLC."  (ECF No. 17, PageID.329, ¶ 11).  To date, CEI Materials has completed over 1,000 wall panel installations and has fabricated over 5,000,000 square feet of architectural metal panels.  (ECF No. 17, PageID.330, ¶ 16; ECF 27-2, Ex. 1, ¶ 9).  CEI Materials' corporate name used "C.E.I. Composite Materials" in which there are periods after the letters "C","E",

and "I," and it also used the word "Composite" in front of the word "Materials."

CEI Materials used a logo in which the letters "CEI" were followed by the words

"composite materials."  (ECF No. 22-7, Ex. 6).  In February 2018, defendant

adopted the assumed name "CEI Materials."  (ECF No. 22-8, Ex. 7).  CEI

Composite Materials shortened its name to "CEI Materials" to reflect the fact that

its fabrication capabilities and services extend beyond composite materials.  (ECF

No. 27-2, Ex. 1, Declaration of Jeff Henry ¶ 26).  According to CEI Group, CEI

Materials refers to itself simply as "CEI," as reflected on its website, which states

"CEI will work with you," the flexibility of our Materials allow CEI..." and "Make

CEI Your Basis of Design."  (ECF No. 1-6, PageID.37).  Further, CEI Materials

modified its stylized logo, which predominantly consists of the letters "CEI" now

over the word "materials" instead of next to "composite materials."  *Id*.

Unlike CEI Group, CEI Materials is not a roofer.  (ECF No. 27-3, Ex. 2,

¶ 10).  Commercial roofing and wall panel work require differing materials, skills,

and technologies.  *Id*. at ¶ 12.  Thus, a bid package for wall panel installation

requires a different scope of work than a roofing package.  *Id*. at ¶ 11.  CEI

Materials manufactures several varieties of wall panels, applying its design and

fabrication expertise to meet applicable codes.  *Id*. at ¶ 15.  CEI Materials obtains

the vast majority of its business through its extensive customer relationships,

grown primarily by word of mouth due to the quality of its goods and services.  *Id*.

at ¶ 22.  Seventy percent of CEI Materials' customers are repeat.  *Id*.  CEI

Materials has an excellent reputation in the industry, even including among certain

customers shared between the parties and other key parties.  (ECF No. 27-4, Ex. 3,

¶ 11; ECF No. 27-5, Ex. 4, ¶ 9; ECF No. 27-6, Ex. 5, ¶ 6.)

Since defendant's 2018 "rebranding," CEI says it has experienced several

instances showing that customers, labor representatives and others were confused

about which "CEI" they were dealing with, or whether CEI and defendant were

affiliated with one another, or whether CEI was responsible for work provided by

defendant.  This actual confusion has manifested in several ways including (1)

repeated instances of confusion by a union representative regarding the absence of

a union workforce on a jobsite, (2) confusion regarding employees' identity(ies)

and affiliation(s), (3) misdirected mail, (4) misdirected e-mails and (5) inquiries

regarding the affiliation between CEI Group and CEI Materials.  (ECF No. 22-12,

Ex. 11, ¶¶ 4-16; ECF No. 22-13, Ex. 12, ¶¶ 5-13).  For example, labor union

representative(s) have contacted CEI complaining that CEI had staffed jobs with

non-union workers.  (ECF No. 22-14, Ex. 13, ¶¶ 6-9).  Yet, on investigation, it was

determined that these jobs were being performed by defendant, not CEI Group.  *Id*.

Additionally, CEI Group's customers, such as Granger, have sent bid invitation

documents to defendant's e-mail address (estimating@ceimaterials.com) believing

they were contacting CEI Group.  (ECF No. 22-15, Ex. 14, ¶¶ 14-16).  And,

several of CEI's customers use a bidding software called "Building Connected."
(ECF No. 22-14, Ex. 14, ¶ 18).  This database provides contact information for
various building contractors, including commercial roofing installers and
commercial exterior wall panel installers.  The Building Connected entry for CEI
lists defendant's mailing address rather than CEI Group's.  *Id*.  CEI Group has
received mail from vendors and suppliers that was intended to be sent to defendant,
including invoices and checks addressed to defendant, but mailed to CEI Group's
address.  (ECF No. 22-12, Ex. 11, ¶¶ 4-16; ECF No. 22-13, Ex. 12, ¶¶ 5-13).
Moreover, CEI Group's long-time customers have been confused as to which
company has provided a bid.  For example, in May 2018, an executive at Turner
Construction reviewed a bid submitted by CEI Materials and thought that it was
submitted by CEI Group.  (ECF No. 22-15, Ex. 14, ¶ 12; ECF No. 22-3, Ex. 2,
¶¶ 10-11).  Mr. Dawson, a construction executive at Turner Construction, was
confused even though Turner is CEI Group's long-time customer and the bid in
question used sub-contracted labor (which CEI Group is known not to provide).
(ECF No. 22-3, Ex. 2, ¶ 11; ECF No. 22-15, Ex.14, ¶ 12).  CEI Group has also
received several inquiries from general contractors, construction managers and
suppliers as to whether CEI Group has any relationship with defendant.  (ECF No.
22-13, Ex. 12, ¶¶ 12-14, 31; ECF No. 22-16, Ex. 15, ¶¶ 7-11).

## III.   DISCUSSION

### A.   Legal Standards

In determining whether injunctive relief is proper, the court considers four factors: (1) whether plaintiffs have a strong likelihood of success on the merits; (2) whether plaintiff has shown irreparable injury; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction. *See Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 760 (6th Cir. 2005). Although no single factor is controlling, the likelihood of success on the merits is often the predominant consideration. *Gonzales v. National Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000) ("[A] finding that there is simply no likelihood of success on the merits is usually fatal.").

Plaintiff bears the burden of demonstrating entitlement to an injunction, and the burden is a heavy one because injunctive relief is "an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). Indeed, the "proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion." *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000); *see also McNeilly v. Land*, 684 F.3d 611, 615 (6th Cir.

2012) ("The proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion because a preliminary injunction is an extraordinary remedy."). "The four considerations applicable to preliminary injunction decisions are factors to be balanced, not prerequisites that must be met." *Hamad v. Woodcrest Condo. Ass'n,* 328 F.3d 224, 230 (6th Cir. 2003) (quoting *Michigan Bell Telephone Co. v. Engler,* 257 F.3d 587, 592 (6th Cir. 2001)). A plaintiff must always, however, show irreparable harm before a preliminary injunction may issue. *Friendship Materials, Inc. v. Michigan Brick, Inc.,* 679 F.2d 100, 104 (6th Cir. 1982).

    B.    <u>Irreparable Harm and Undue Delay</u>

CEI Group contends that it will suffer irreparable harm in the form of loss of competitive bidding opportunities and associated revenues. CEI Group explains that the construction industry frequently utilizes a competitive bidding process (implemented through the Building Connected software platform) for contract installers like CEI. (ECF No. 22-3, Ex. 2, ¶ 9). Once the bidding process is closed, CEI Group does not have an opportunity to submit a bid, and that business opportunity is permanently lost. (ECF No. 22-3, Ex. 2, ¶ 9; ECF No. 22-15, Ex. 14, ¶¶ 14-18). According to CEI Group, this loss is further compounded when, due to a party's confusion, CEI Materials is afforded an opportunity to bid a project and CEI Group is not. Thus, because of CEI Materials' infringement, CEI Group

says it may be unaware that a bidding opportunity even exists and, consequently, despite CEI Group's reputation, by not receiving bidding opportunities, CEI Group will lose business opportunities and indeterminable revenue.  (ECF No. 22-15, Ex. 14, ¶ 18).  CEI Group also points out that this harm is not just theoretical, as evidenced by customers mistakenly sending bid documents to CEI Materials that were intended for CEI Group.  (ECF No. 22-15, ¶¶ 14-16).  CEI also points to the fact that Turner Construction's Building Connected System listed CEI Materials' physical and email addresses under CEI Group's name and contact information. (ECF No. 22-15, Ex. 14, ¶ 18).  As a result, mail intended for CEI Group may have been mistakenly sent to CEI Materials.  Additionally, CEI Group receives mail and email intended for CEI Materials.  (ECF No. 22-12, Ex. 11, ¶¶ 14-16; ECF No. 22-13, Ex. 12, ¶¶ 4-13).

In response, CEI Materials argues that CEI Group's delay in seeking injunctive relief severely undermines, if not eliminates, its claim to irreparable harm.  "Significant delay in applying for injunctive relief in a trademark case tends to neutralize any presumption that infringement alone will cause irreparable harm pending trial, and such delay alone may justify denial of a preliminary injunction for trademark infringement." *Blockbuster Entertainment Group v. Laylco, Inc.*, 969 F.Supp. 505 (E.D. Mich. 1994) (quoting *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 275-76 (2d Cir. 1985)).  "An unreasonable delay in filing for injunctive relief

will weigh against a finding of irreparable harm." *Huron Mountain Club v. U.S. Army Corps of Eng'rs*, 545 Fed. Appx. 390, 397 (6th Cir. 2013) (quoting *Allied Erecting and Dismantling Co. v. Genesis Equip. & Mfg., Inc.*, 511 Fed. Appx. 398, 405 (6th Cir. 2013) (finding that a six-year delay in seeking injunctive relief weighed against finding of irreparable harm)).  It is within the court's discretion to determine whether the delay was unreasonable, and thus weighs against a finding of irreparable harm.  *York Risk Services Group, Inc. v. Couture*, 787 Fed. Appx. 301, 309 (6th Cir. 2019).  Not all delays in seeking injunctive relief are unreasonable.  *Id*. (citing *Grand Lodge, Fraternal Order of Police v. Labor Council Mich. Fraternal Order of Police, Inc.*, 38 F.3d 1215, 1994 WL 589569, at *2-3 (6th Cir. 1994) (unpublished table opinion) (holding that a two or three-year delay from the first occurrence of copyright infringement to the filing of the lawsuit was not unreasonable and did not mandate a ruling that irreparable harm did not exist); *Chabad of S. Ohio & Congregation Lubavitch v. City of Cincinnati*, 363 F.3d 427, 436 (6th Cir. 2004) (finding that a six-month delay between a cause of action arising and seeking a preliminary injunction was not "sufficient grounds for a reversal of the district court's decision to grant the preliminary injunction")); *see also Wells Fargo & Co. v. WhenU.com, Inc.*, 293 F.Supp.2d 734, 771-772 (2003) (Delay of nine months in bringing motion for injunctive relief undermines allegation of irreparable harm.).

CEI Materials points out that CEI Group had actual knowledge of CEI Materials dating back to 2012 when it first worked with defendant.  (ECF No. 20, PageID.515, ¶ 45; ECF No. 22-15, PageID.673-75, ¶¶ 5-11).  And, CEI Group was aware of CEI Materials' allegedly infringing activity dating back to 2013, when CEI Materials fabricated and installed wall panels at the University of Michigan's Schembechler Hall.  (ECF No. 20, PageID.516, ¶ 47; ECF No. 22-14, PageID.667, ¶ 4; ECF No. 22-2, ¶ 33).  CEI Group claims there was evidence of confusion between the parties in connection with that 2013 project.  (ECF No. 22-14 at PageID.667, ¶¶ 4-5).  CEI Materials says this suggests that CEI Group had actual knowledge of CEI Materials dating back to 2013 and actual or constructive knowledge of CEI Materials' alleged infringing wall panel installation activity at least six years before filing its motion for preliminary injunction.

CEI Group turns the focus to 2018, when CEI Materials rebranded, and when it issued its cease and desist letter of October 2, 2018.  CEI Group asserts that counting against it, the time elapsed between CEI Materials' 2018 rebranding and the filing of this motion for preliminary injunction in October 2019, ignores several important facts:  (1) that principals of the parties personally discussed the issues raised in the cease and desist letter on October 2, 2018, (2) that the parties did in fact have a conversation and realized that no resolution was obtainable absent litigation and (3) that injunctive relief has consistently been included in

settlement discussions. *PHG Techs., LLC v. TimeMed Labeling Sys., Inc*., 2006 WL 2670967, at *19 (M.D. Tenn. Sept. 18, 2006) (no undue delay where plaintiff waited to seek preliminary injunction until conclusion of settlement talks); *Wynn Oil Co. v. Am. Way Serv. Corp*., 943 F.2d 595, 608 (6th Cir. 1991) (two-year delay did not preclude injunctive relief).

Even assuming that the 18-month delay between the rebranding and the motion, and the one-year delay between the cease and desist letter and the motion were reasonable delays,[1] CEI Group does not address its actual awareness of the potential for confusion dating back to 2013. (ECF No. 22-14, Ex. 13, ¶¶ 4-5). Specifically, CEI Group was surprised to learn from the University of Michigan, with whom it had worked for over 20 years, that the University believed it was working with CEI Group on the Schembechler Hall project, even though CEI Materials was performing work there. *Id*. CEI Group maintains that the confusion increased in 2018, causing them to act at that point in time. However, the alleged increase in confusion does not vitiate its knowledge of actual confusion for six years before bringing the motion for preliminary injunction. In the court's view,

---

[1] The Court is not persuaded that the one-year delay from the cease and desist letter to the filing of the motion for preliminary injunction is reasonable either. While *Grand Lodge* suggests that a delay due to a change in counsel and efforts to resolve the dispute is not unreasonable, CEI Group does not offer evidence suggesting that the parties were trying to resolve this matter for that entire period. Indeed, CEI Group's argument suggests that the parties realized rather quickly that litigation would be required to resolve the matter. Although the length of negotiation is not clear on this record, the evidence in the record suggests that the delay was not due to settlement negotiations.

waiting six years after having obtained knowledge of actual confusion is undue delay that undermines its claim to irreparable harm.  Yet, the court acknowledges that such a delay does not necessarily preclude any possibility of relief or completely foreclose a showing of irreparable harm.  *Burton v. Kettering Adventist Health Care*, 2020 WL 3265526, *3 (S.D. Ohio June 17, 2020).  Accordingly, the court will assess the remaining factors to be weighed.

    B.    <u>Likelihood of Success on the Merits</u>

In the Sixth Circuit, to prevail on a Lanham Act trademark infringement claim, a plaintiff must establish that: (a) it has a valid and legally protectable mark; (b) it owns the mark; and (c) the defendant's use of the mark to identify goods or services causes the likelihood of confusion.  *Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.,* 502 F.3d 504, 512-13 (6th Cir. 2007).  Trademark infringement under Michigan law employs the same likelihood of confusion test.  *Homeowners Grp., Inc. v. Home Mktg. Specialists, Inc*., 931 F.2d 1100, 1105 n.1 (6th Cir. 1997).

    *1.    Valid and legally protected marks/ownership of the marks*

CEI Group owns U.S. Trademark Registration Nos. 1,513,926 for "CEI and design," (registered in 1988) and 1,516,681 for "CEI," (registered in 1988) both used in connection with "installation of roofing systems."  (ECF No. 22-4, 22-5, Exs. 3-4).  CEI Group also owns U.S. Trademark No. 5,805,215 for "CEI" for siding and wall panel installation services, which was registered on July 16, 2019.

(ECF No. 22-6, Ex. 5).  CEI Group maintains that it is entitled to the presumption

that these marks are valid and protectable.  *B & B Hardware, Inc. v. Hargis Indus*.,

*Inc*., 135 S. Ct. 1293, 1300 (2015).  Likewise, CEI Group says its common law

marks are also valid and deserving of trademark protection.  Specifically, for close

to 40 years, the "CEI" trademarks have been a source identifier for CEI's

commercial roofing systems installation and sheet metal fabrication services.

(ECF No. 22-2, Ex. 1, ¶ 10; *see also* 15 U.S.C. § 1127 (defining a trademark as

"any word, name, symbol or device . . . [that] identif[ies] and distinguish[es] . . .

goods, including a unique product, from those manufactured or sold by others and

to indicate the source of the goods, even if that source is unknown").  Further, CEI

Group contends that it (through its predecessors) has used the "CEI" mark in

connection with its wall panel installation services since at least 1999.  (ECF No.

22-2, Ex. 1, ¶¶ 22-23).  CEI Group has also used the mark "CEI MICHIGAN" in

connection with its roofing, sheet metal fabrication and wall panel installation

services since 2005.  (ECF No. 22-2, Ex. 1, ¶ 13).  These common law trademark

rights have arisen through use by CEI Group's wholly owned subsidiary and

operating entity CEI Michigan.  *Id*.

    CEI Materials questions the ownership of the 1,513,926  ("'926") and

1,516,681 ("'681") marks because it appears that a purported predecessor to CEI

Group -- CEI Industries, Inc., and the related entity claiming to assign CEI Group

the '926 and '681 Registrations on March 17, 2004, administratively dissolved in 1997. (ECF No. 27-9, Ex. 8, Ownership Timeline; ECF No. 27-10, Ex. 9, LARA, CEI Industries, Inc.; ECF No. 27-11, Ex. 10, LARA, CEI Group, LLC; ECF No. 22-25, PageID.720). According to CEI Materials, conveyances of property from a dissolved company are generally invalid, unless as part of winding up the business. 16A FLETCHER CYCLOPEDIA OF THE LAW OF CORPORATIONS § 8137 (2019); *Homesafe Inspection*, *Inc. v. Hayes*, 2016 WL 12347588 (N.D. Miss. Jan. 28, 2016) (patent assignment made by an administratively dissolved corporation invalid). In reply, CEI Group points out that Michigan's corporation statute provides that "title to the corporation's assets remains in the corporation until transferred by it in the corporate name." Mich. Comp. Laws § 450.1834. CEI Materials concedes that a corporation in dissolution may transfer its assets as part of winding up the business, and there is no requirement in Michigan's current Business Corporation Act that a business must wind-up its affairs within a set period of time. As a result, CEI Group contends that CEI Materials' theory does not invalidate its ownership of the CEI Marks. The court agrees with CEI Group. There appears little real dispute that the marks are valid and that CEI owns them.

### 2. *Likelihood of confusion*

A plaintiff asserting a Lanham Act violation under 15 U.S.C. §§ 1114 and 1125 must show that the infringing mark creates a likelihood of confusion

concerning the origin of the goods or services.  *See Progressive Distrib. Servs., Inc. v. U.P.S., Inc.*, 856 F.3d 416, 424 (6th Cir. 2017).  The Sixth Circuit uses an eight-factor test to determine whether a likelihood of confusion exists: (1) strength of the mark; (2) relatedness of the goods or services; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) likely degree of purchaser care/sophistication; (7) the defendant's intent in selecting its mark; and (8) likelihood of expansion of the product lines.  *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 280 (6th Cir. 1997). Nevertheless, these factors are not a mechanical test and "[]not all of these factors will be relevant in every case."  *Id*.  The "ultimate question remains whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way."  *Id*.

a.  *Evidence of actual confusion*

CEI Group says that actual confusion has occurred despite the high degree of care exercised by consumers.  CEI Group and CEI Materials' customers are professional buyers, who typically use the highest degree of care.  Yet, CEI Group's long-time customers, like Turner, Granger, and J.S. Vig Construction Company have been confused as to whether CEI Group or CEI Materials have submitted bid documents.  (ECF No. 22-3, Ex. 2, ¶¶ 10-11; ECF No. 22-12, Ex. 11, ¶¶ 4-16; ECF No. 22-16, Ex. 15, ¶¶ 7-8; ECF No. 22-14, Ex. 13, ¶¶ 12-17, 22, 39,

30-38; 23, 26, 27).  For example, Ron Dawson at Turner Communication declared that he reviewed a bid submitted by CEI Materials and thought the bid was from CEI Group.  (ECF No. 22-3, Ex. 2, ¶ 11).  According to Mr. Dawson, "[t]he similarity of the company names with both being in the same business was confusing to me and I believe could cause an issue in our bidding and pricing of projects."  *Id*.  CEI Group asserts that the fact that CEI Materials' use of "CEI" has caused actual confusion among these professional buyers demonstrates that this actual confusion cannot be undone–and thus–CEI Group will likely prevail on its trademark infringement and unfair competition claims.  *Daddy's Junky Music Stores, Inc.*, 109 F.3d at 284 ("Evidence of actual confusion is undoubtedly the best evidence of likelihood of confusion").

While it is true that "[n]othing shows the likelihood of confusion more than the fact of actual confusion," *Groeneveld Transp. Efficiency, Inc. v. Lubecore Int'l, Inc.*, 730 F.3d 494, 509 (6th Cir. 2013), "[i]solated instances of confusion are insufficient to support a finding of likely confusion."  *Progressive Distribution Services, Inc. v. United Parcel Service, Inc.*, 856 F.3d 416, 433 (6th Cir. 2017) (citing *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 299 (3d Cir. 2001)).  Further, reliance on isolated incidents of confusion is inappropriate where the circumstance suggest that further instances of confusion are unlikely.  *Progressive Distribution Services*, 856 F.3d at 434 (citing *Daddy's*

*Junky Music Stores, Inc.*, 109 F.3d at 284 (finding that there was no evidence that the same individuals who "receive[d] plaintiff's mailings also receive[d] defendant's mailings"). Indeed, courts typically decline to credit isolated instances of actual confusion. *Id.* (citing *Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 635 (6th Cir. 2002); ("[s]ix confused customers is legally insignificant"); *George & Co. LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 399 (4th Cir. 2009) (four instances of consumer confusion is at best *de minimis*); *Packman v. Chicago Tribune Co.*, 267 F.3d 628, 645 (7th Cir. 2001) (discounting four callers as *de minimis* evidence of confusion)).

The incidents of confusion that CEI Group has offered appear to be isolated incidents that were easily resolved and did not result in the loss of any business or other harm. And as to the two emails containing photocopies of checks and waiver documents from the J.S. Vig Construction Company intended for CEI Materials that were accidentally sent to CEI Group (ECF No. 22-12), they do not appear to be significant given that Valerie Vig, J.S. Vig's president, does not believe relevant personnel at J.S. Vig are confused. (ECF 27-4, Ex. 3, ¶ 10). Further, CEI Group's allegations of confusion related to Turner Construction's Ron Dawson does not seem significant given that Mr. Dawson's affidavit suggest that he recognized CEI Group and CEI Materials are different entities but believes the similarity in names could cause an issue in bidding and pricing projects. (ECF No. 22-3 at

PageID.614, ¶ 11) ("Both CEI Group and CEI Materials were invited contractors in the Building Connected database and requested to submit bids for [a project for Henry Ford Health System].  I reviewed the bid submitted by CEI Materials and mistakenly thought that CEI Group had submitted the bid.  The similarly of the company names with both being in the same business was confusing to me and I believe could cause an issue in our bidding and pricing of projects.").

The incidents of confusion where a bid invitation was mistakenly sent to CEI Materials (Dkt. No. 22-15 at PageID.676-77, ¶¶ 14-17) and an error in the "Building Connected" bidding system in which CEI Group's entry apparently listed CEI Materials' address, did not result in the loss of a bid.  *Id*. at PageID.677, ¶ 18.  CEI Group does not address whether the address error was or can be corrected.  Next, the email exchange between Mr. Reid and John Strumpf of ALPOLIC, a manufacturer of metal composite materials (ECF No. 22-24) does not suggest confusion between CEI Group and CEI Materials, as claimed by CEI Group.  (ECF No. 22-15, PageID.681, ¶¶ 26-29).  Indeed, Mr. William Yannetti, President of Mitsubishi Chemical Composites America ("MCCA")—which does business under the trademark ALPOLIC—addresses this exchange in his declaration and states that MCCA's concerns over doing business with CEI Group were unrelated to any alleged confusion.  (ECF No. 27-6, Ex. 5, Yannetti Decl., ¶¶ 10-14).  Finally, as to the 2013 Schembechler Hall project, Mr. Richard

Wellman, a subcontractor on the project, declares that he is not and has never been confused between CEI Group and CEI Materials.  (ECF No. 27-5, Ex. 4, Wellman Decl., ¶¶ 6-8).  As explained in *Homeowners Group*, where the parties have been doing business in the same area for some time and have advertised extensively, isolated incidents of confusion are not conclusive nor are they entitled to great weight.  "Indeed, the existence of only a handful of instances of actual confusion after a significant time or a significant degree of concurrent sales under the respective marks may even lead to an inference that no likelihood of confusion exists."  *Homeowners Group, Inc. v. Home Marketing Specialists, Inc.*, 931 F.2d 1100, 1110 (6th Cir. 1991) (citing *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 260 (5th Cir.), cert. denied, 449 U.S. 899 (1980)).  The court concludes that these isolated incidents of confusion – to the extent they evidence confusion – do not particularly weigh in favor of a finding of likely confusion.

      b.    *Strength of the CEI mark*

CEI Group's maintains that its marks are strong and have been in continuous use for almost 40 years by CEI Group and its predecessors, subsidiaries and affiliates.  *Herman Miller, Inc. v. Palazzetti Imports & Exports, Inc.*, 270 F.3d 298, 311-12 (6th Cir. 2001) (noting that evidence relevant to commercial strength include direct consumer testimony; exclusivity, length, and manner of use; amount and manner of advertising; and amount of sales and number of customers).  CEI

21

Group also asserts that it has spent considerable resources establishing its brand

and the goodwill connected to the CEI marks.  (ECF No. 22-2, Ex. 1, ¶ 10).

Moreover, CEI Group says its incontestable CEI registrations are presumed to be

strong. *Jet, Inc. v. Sewage Aeration Sys.*, 165 F.3d 419, 422 (6th Cir. 1999).

Yet, extensive third-party use of a mark weakens the mark. *Citizens

Banking Corp. v. Citizens Financial Group, Inc.*, 320 Fed. Appx. 341, 346-47 (6th

Cir. 2009).  This is because "strength of a mark" is not only a question of

distinctiveness but "how clearly it is actually associated with a particular source."

*Id*.  CEI Materials proffers evidence that third-party use of "CEI" in connection

with commercial construction is quite extensive.  All told, CEI Materials lists 11

third-party federal and state trademark "CEI" registrations in the construction

and/or engineering space.  (ECF No. 27-14, Ex. 13, List of Third-Party Uses).

Dozens more common law uses, domain names, web pages, and business names

are included in CEI Materials' List of Third-Party Uses.  *Id*.  CEI Materials argues

that this extensive third-party use of CEI weakens CEI Group's claims,

undercutting its claims of confusion.

The strength of the mark factor "focuses on the distinctiveness of a mark and

its recognition among the public." *Therma-Scan*, 295 F.3d at 631; *see also

Homeowners Grp.*, 931 F.2d at 1107 ("[a] mark is strong if it is highly distinctive,

i.e., if the public readily accepts it as the hallmark of a particular source").  "The

more distinct a mark, the more likely is the confusion resulting from its

infringement, and therefore, the more protection it is due." *Daddy's Junky Music

Stores*, 109 F.3d at 280.  Thus, a strong mark enjoys greater protection.

*Progressive Distribution Services*, at 427-428.  The strength evaluation

encompasses two separate components: "(1) 'conceptual strength,' or 'placement

of the mark on the spectrum of marks,' which encapsulates the question of inherent

distinctiveness; and (2) 'commercial strength' or 'the marketplace recognition

value of the mark.'"  *Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc.*, 679

F.3d 410, 419 (6th Cir. 2012) (quoting 2 J. Thomas McCarthy, McCarthy on

Trademarks and Unfair Competition § 11.83 (4th ed.)).  A mark's distinctiveness

and resulting conceptual strength "depends partly upon which of four categories it

occupies: generic, descriptive, suggestive, and fanciful or arbitrary." *Therma-

Scan*, 295 F.3d at 631 (internal quotation marks omitted).  A descriptive mark

"specifically describes a characteristic or ingredient of an article," while an

arbitrary mark "has a significance recognized in everyday life, but the thing it

normally signifies is unrelated to the product or service to which the mark is

attached, such as CAMEL cigarettes or APPLE computers." *Id*. (internal quotation

marks and brackets omitted).  "A descriptive mark, by itself, is not protectable."

*Innovation Ventures, LLC v. N.V.E., Inc*., 694 F.3d 723, 730 (6th Cir. 2012).

However, a "merely descriptive term can, by acquiring a secondary meaning, i.e.,

becoming distinctive of the applicant's goods, become a valid trademark." *Id.*

(internal quotation marks and ellipses omitted); *see Induct-O-Matic Corp. v.*

*Inductotherm Corp.*, 747 F.2d 358, 364 (6th Cir. 1984) (descriptive mark becomes

distinctive through advertising and reputation).

    CEI Group does not specifically address whether its mark is generic,

descriptive, suggestive or fanciful/arbitrary.  Even assuming that its marks are

arbitrary and therefore, highly distinctive, it has offered little evidence of customer

recognition or market strength.  *Homeowners Group, Inc. v. Home Marketing*

*Specialists, Inc*., 931 F.2d 1100, 1107-1108 (6th Cir. 1991).  CEI Group offers the

following:

> In 1982 CEI hired Detroit public relations firm Franco to
> create a national marketing plan for CEI. CEI spent
> $110,000 at the time to re-imagine and re-image what
> was then known as Cook Enterprises Incorporated and its
> various sister companies into a national group of
> companies called "CEI". Franco came up with the new
> name, and in 1987 the predecessor to CEI filed
> applications for federal trademark registrations for both
> "CEI" and the CEI logo. CEI (and/or its licensees) have
> continued to use those marks for all of our services, and
> we have spent considerable resources promoting our
> brand and its reputation. The $110,000 in 1982 included:
> customer survey, name change to CEI, new logo, new
> brochure, national promotion in various media, new
> letterhead, and quarterly newsletters.

(ECF No. 22-2, ¶ 10).  But, CEI Group does not produce any evidence of market

recognition.  *See Homeowners Group*, 931 F.2d at 1107-1108 (Evidence of

advertising budget has an attenuated link to market recognition and fact that plaintiff deals strictly with real estate brokers suggests that its marks are limited to the narrow universe of brokers and salespeople who purchase specialized commercial products).  Given the lack of evidence on market recognition, and CEI Materials' evidence suggesting significant third-party use of the CEI mark, the court finds that this factor weighs against a finding of likely confusion.

### c.    *Relatedness of goods and services*

Courts have recognized that there are basically three categories of cases: (1) direct competition of services, in which case confusion is likely if the marks are sufficiently similar; (2) services are somewhat related but not competitive, so that likelihood of confusion may or may not result depending on other factors; and (3) services are totally unrelated, in which case confusion is unlikely.  *Homeowners Group*, 931 F.2d at 1108.  As explained in *Homeowners Group*, "services are 'related' not because they coexist in the same broad industry, but are 'related' if the services are marketed and consumed such that buyers are likely to believe that the services, similarly marked, come from the same source, or are somehow connected with or sponsored by a common company."  *Id.* at 1109.  "The question is, are the [services] related so that they are likely to be connected in the mind of a prospective purchaser?"  *Id.* (quoting *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 314 F.2d 149, 159 (9th Cir.), cert. denied, 374 U.S. 830 (1963)).

CEI Group points out that both entities are contractors in the commercial construction industry and competing to provide their services to the same group of customers–e.g., general contractors, construction managers and property managers on commercial construction projects.  Further, as discussed above, CEI Group maintains that actual confusion is occurring with CEI's customers, which it says demonstrates that CEI Group's and CEI Materials' goods/services (1) are similar, (2) travel in the same channels of trade and (3) are directed to the same type of consumers as well as the same specific customers.  (ECF No. 22-2, Ex. 1, ¶ 13; ECF No. 22-12, Ex. 11, ¶¶ 4-16; ECF No. 22-15, Ex. 14, ¶¶ 5-31).

On the other hand, CEI Materials points out that commercial roofing and wall panel services are unrelated.  Wall panel fabrication and installation is very different from roofing system installation, requiring vastly different labor skills, equipment, and experience.  (ECF No. 27-3, Ex. 2, Sherrill Decl., ¶¶ 12-16).  Notably, the extent of CEI Group's involvement in wall panel installations, especially before 2008 when CEI Materials was founded, is not entirely clear.  CEI Group says that it has regularly installed metal wall panels since 1999 but it has disclosed only two wall panel installations, both Michigan-based.  (ECF No. 22-2, Ex. 1, ¶¶ 22-23).  CEI Materials also points out that two of CEI Group's three registered "CEI" marks (Reg. Nos. 1,513,926 ("'926 Reg.") (graphic) and 1,516,681 ("'681 Reg.") (word)) do not mention wall panels at all.  And none of

CEI Group's historical marketing materials or the specimen it included with the

'215 App. list any pre-2008 wall panel installations, which is when CEI Materials

began regularly installing wall panels.  (ECF No. No. 17, PageID.331, 333-34,

¶¶ 23-26, 31, 40-42).

While both parties are in a related industry, CEI Group has not presented

much evidence regarding the extent of its wall panel installation work before 2008

or how such services are marketed.  Yet, it is wall panel installation, not the other

services offered by CEI Group or the manufacture of wall panels by CEI Materials,

that ties the two companies together.  CEI Group has presented little evidence

showing that the parties' common services are "marketed and consumed such that

buyers are likely to believe that the services, similarly marked, come from the

same source, or are somehow connected with or sponsored by a common

company." *Homeowners Group*, 931 F.2d at 1109.  Such a showing requires

evidence suggesting that "the [services are] related so that they are likely to be

connected in the mind of a prospective purchaser." *Id*. (quotation omitted).

Instead, it again points to isolated instances of confusion, as opposed to evidence

of marketing and consumption showing that customers are likely to believe that the

wall panel installation services offered by both companies are actually offered by a

common company.  In contrast, CEI Materials offers evidence about how the

parties' market their services in very different ways.  CEI Group's main business

comes from being invited to bid generally by a general contractor.  (ECF No. 22 at PageID.571).  CEI Materials, on the other hand, rarely bids to general contractors for wall panel installation work and primarily bids its fabrication goods and services to other installers of wall panels.  (ECF No. 27-2, Henry Decl., ¶ 23).  The notable difference in how the parties market their products and services does not suggest a likelihood of confusion.  Accordingly, the court finds that this factor does not weigh in favor of a finding of confusion.

> d. *Mark similarity*

CEI provides commercial roofing and exterior wall panel installation services under the marks "CEI" and "CEI MICHIGAN."  (ECF No. 22-2, Ex. 1, ¶¶ 7, 10, 17-18).  CEI Group has registered "CEI" in standard characters and in a design format.  (ECF No. 22-4 to 22-6, Exs. 3-5).  Additionally, CEI Group has established common law trademark rights in CEI MICHIGAN through use.  According to CEI Group, CEI Materials' marks subsequent to its rebranding in connection with its wall panel fabrication and installation services are identical or nearly identical to CEI:

| CEI Group's "CEI" Mark(s) | Defendant's "CEI" Mark(s) |
|---|---|
| CEI <br> (Exs. 4,6.) | CEI <br> (ECF No. 16-7) |
| **CEI** <br> (Ex. 5) |  <br> (ECF no. 16-8) |
| CEI MICHIGAN <br> (Ex. 1, ¶13) | CEI MATERIALS <br> (ECF No. 16-8) |

The similarity of marks is given "considerable weight" in the likelihood of confusion analysis. *Daddy's Junky Music Stores*, 109 F.3d at 283. In determining similarity, "courts should consider the pronunciation, appearance, and verbal translation of conflicting marks." *Id*. "It is the overall impression of the mark, not an individual feature that counts." *Homeowners Grp.*, 931 F.2d at 1109. CEI Materials acknowledges that the CEI portion of the marks are similar but contends that courts assessing similarity do not examine the marks "side-by-side" but instead ask "whether the mark will be confusing to the public when singly presented." *Progressive Distribution Servs.*, 856 F.3d at 432. CEI Materials says that it always includes its entire name—CEI Materials—in connection with its logo. It never uses "CEI" alone when bidding projects or otherwise, (ECF No. 27-2, Ex. 1, Henry Decl., ¶ 24), which reduces the likelihood of confusion. *Therma-Scan, Inc*., 295 F.3d at 634 (collecting cases).

The court finds this case similar to that presented in *Homeowners Group*, where both marks contained the letters "HMS" with a roof over the lettering, but the purportedly infringing mark also included the words "Home Marketing Specialists" underneath the stylized letters and roof image.  The court found that confusion did not necessarily follow because the marks in their entirety, created substantially different commercial impressions.  *Id*. at 1109.  While the similarity is significant, the evidence suggests that CEI Materials does not typically use the letters "CEI" by itself, except as shorthand on its website in some areas.  (ECF No. 16-7).  Overall, the court finds that this factor weighs slightly in favor of a finding of confusion.

e.   *Remaining factors*

CEI Group does not address the remaining *Frisch* factors -- likely degree of customer care/sophistication, mark selection, mark overlap/marketing, and likelihood of expansion of product lines.  CEI Materials does offer some analysis on some these remaining factors.  Neither party addresses the factor of likelihood of expansion of product lines.

As to the likely degree of customer care/sophistication, CEI Materials argues that this factor weighs against a finding of confusion.  It points out that "when a buyer has expertise or is otherwise more sophisticated with respect to the purchase of the services at issue ... other things being equal, there is less likelihood of

confusion." *Homeowners Grp.*, 931 F.2d at 1111; *see also Kibler*, 843 F.3d at 1080-1081.  Commercial entities are generally considered to be sophisticated.  *See AWGI, L.L.C. v. Atlas Trucking Co., L.L.C.*, 381 F.Supp.3d 832, 849-50 (E.D. Mich. 2019).  Moreover, CEI Group admits that its commercial consumers are sophisticated and exercise a "high degree of care," but claims that actual confusion still persists.  (ECF No. 22, PageID.580).  Yet, CEI Group has not identified any instances in which any customer awarded a project or bid to CEI Materials by mistake.  According to CEI Materials, "any brief confusion a sophisticated commercial construction bidder may experience will be quickly dispelled by the complexity of the bidding process."  (ECF No. 27-2, Ex. 1, Henry Decl., ¶¶ 37-42).

As explained in *Homeowners Group*, in assessing the likelihood of confusion to the public, the standard used by the courts is the generally the typical buyer exercising ordinary caution.  *Id*. at 1111.  However, when a buyer has expertise or is otherwise more sophisticated with respect to the purchase of the services at issue, a higher standard is applied.  Similarly, when services are expensive or unusual, the buyer can be expected to exercise greater care in her purchases.  When services are sold to such buyers, other things being equal, there is less likelihood of confusion.  *Id.* (citing 3A R. Callmann, §§ 20.11-.12; 2 J. McCarthy, §§ 23:28-:29).  Just as in *Homeowners*, it appears quite likely here that the buyers of both CEI Group and CEI Materials services are likely to exercise a

high degree of care, given their sophistication and the typical bidding process used to purchase such services.

As to the mark selection, CEI Group has not alleged that CEI Materials chose its name with any ill intent.  Rather, CEI Materials' founders chose "CEI" in 2008 to signify Commitment, Enthusiasm, and Integrity, principles they wanted to guide their new business.  (ECF No. 27-2, Ex. 1, Henry Decl., ¶ 6).  Accordingly, this factor does not weigh in favor of a finding of likely confusion.

Finally, as to market overlap, this factor requires a comparison of "how the parties market their products and their main customers."  *Kibler*, 843 F.3d at 1079; *Homeowners Grp.,* 931 F.2d at 1110.  The less the overlap between channels and buyers, the less likely confusion is to result.  *Id*.  According to CEI Materials, while the parties' markets may share some similarities, the overlap is considerably less so for their respective primary customers.  (ECF No. 27-2, Ex. 1, Henry Decl., ¶ 36.) CEI Group's main business comes from being invited to bid generally by a general contractor.  (ECF No. 22 at PageID.571).  In contrast, CEI Materials rarely bids to general contractors for wall panel installation work and primarily bids its fabrication goods and services to other installers of wall panels.  (ECF No. 27-2, Ex. 1, Henry Decl., ¶ 23).  Accordingly, it appears that this factor does not weigh in favor of a finding of likely confusion.

C.      Balance of Harms

CEI Group maintains that CEI Materials will not be harmed by its request

that it cease all use of "CEI" in connection with exterior wall and fabrication

installation services.  This is so, according to CEI Group, because CEI Materials

can continue its business under another name.  CEI Group points out that CEI

Materials has only recently rebranded itself as "CEI" and "CEI MATERIALS."

Before February 2018, it used the marks "C.E.I." and "C.E.I. COMPOSITE

MATERIALS."  It was after the rebranding to "CEI Materials" that CEI began to

experience increased instances of actual confusion.  Thus, while CEI Materials

may be harmed if it had to rebrand its fabrication business, CEI Group argues that

any harm to CEI Materials is outweighed by both the irreparable harm to senior

trademark user and registrant CEI and the actual confusion being experienced by

the relevant consumers.

In response, CEI Materials says that CEI Group's allegations of harm are

speculative.  In contrast, an injunction will result is irreversible harm to CEI

Materials by forcing it to change its name and undertake the costs of rebranding,

which alone are likely over $350,000.  (ECF No. 27-2, Ex. 1, ¶ 52).  This does not

include additional costs associated with securing new licensing documentation,

testing certificates, and pre-qualifications.  (ECF No. 27-2, Ex. 1, Henry Decl.,

¶¶ 53-54; ECF No. 27-3, Ex. 2, Sherrill Decl., ¶¶ 25-27).  The disruption to its

licenses (and thus contracts) alone will result in delays and possible work stoppages on some projects.  (ECF No. 27-3, Ex. 2, Sherrill Decl., ¶ 26).

Moreover, CEI Materials points out that injunctions seeking to change the status quo – as CEI Group seeks to do here – are disfavored and subject to a higher burden. *Taylor v. Corizon Med. Corp.*, 2018 WL 2437561, *2 (E.D. Mich. May 10, 2018).  Courts identify three types of "particularly disfavored" injunctions, all of which seek affirmative relief: "(1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of the trial on the merits." *Id*.  Here, CEI Group's proposed injunction would result in all three outcomes by requiring CEI Materials to change its name, altering the status quo. And, it would also essentially afford CEI Group all the relief it seeks in that if CEI Materials must now change its name to operate, yet ultimately prevails in this litigation, reverting back to "CEI" would make little sense.  (ECF No. 27-2, Ex. 1, Henry Decl., ¶ 55).  Thus, if forced to change its name now, CEI Material's goodwill associated with its use of "CEI" will be irrevocably lost.  *Id*.

The court agrees with CEI Materials that the harm it faces if the injunction issues is more severe than the harm to CEI Group if the injunction does not issue. As discussed in detail above, the actual incidents of confusion are fairly limited and have resulted in no actual harm to CEI Group.  Requiring CEI Materials to

undergo a costly name change and rebranding before a final decision on the merits

issues in this case is simply too burdensome when considering the delay in

bringing this motion for injunctive relief and the limited evidence of confusion

presented by CEI Group.

D.    The Public Interest

CEI Group argues that an injunction serves the public interest because there

is a strong public interest in knowing the source of the commercial construction

services like wall panel installations.  CEI Group has many years of experience and

an established reputation for (1) providing high-quality roofing and exterior wall

panel installation services and (2) employing a highly skilled union workforce.

The public interest is served because consumers have an interest in knowing which

company is providing the contracted roofing installation or wall panel installation

services.  Based on CEI Materials' infringement, CEI Group argues that the public

is not assured that they are getting the same quality materials/services under the

CEI mark. *See Hungry Howie's*, 2015 WL 13617311, at *4 ("an injunction is in

the public's interest because it will further the two purposes of trademark law:

preventing consumer confusion and deception in the marketplace and protecting

the trademark holder's property interest in the mark").

In response, CEI Materials maintains the public interest is served by denying

the motion for preliminary injunction, given the "strong public interest in free and

fair competition." *Bailey v. Chattem, Inc.*, 684 F.2d 386, 391 (6th Cir. 1982). CEI Materials suggests that the timing CEI Group's request for injunctive relief raises a strong suspicion that it is using it as a mechanism for inhibiting competition, not protecting its own intellectual property.

Both parties bring forth points that serve the public interest. In the Court's view, given the delay in bringing the motion for preliminary injunction and the minimal evidence of confusion, along with the significant harm to CEI Materials, the public interest would not be served by the issuance of a preliminary injunction.

## IV. CONCLUSION

As explained above, in balancing all the factors to be considered before a preliminary injunction issues, the court finds that CEI Group unreasonably delayed in bringing this motion, and thus, its claim to irreparable harm is greatly diminished. In addition, the court finds it unlikely that it will succeed on merits of its trademark claim because there is scant evidence of the likelihood of confusion. The balance of harms weighs against the issuance of a preliminary injunction because of the great harm to CEI Materials should an injunction issue, particularly where the factors of irreparable harm to CEI Group and likelihood of success of the merits are not strong. Finally, given that all these factors weigh against the issuance of a preliminary injunction, the public interest would not be served by issuing a preliminary injunction.

For these reasons, the motion for preliminary injunction is **DENIED**.

**IT IS SO ORDERED**.

Date: February 12, 2021                    <u>s/Stephanie Dawkins Davis</u>
                                           Stephanie Dawkins Davis
                                           United States District Judge